# C. F. EDWARDS v. STATE.

No. A-1507.   Opinion Filed May 3, 1913.

(131 Pac. 956.)

1. **CHANGE OF VENUE—Discretionary Ruling—Appeal.** (a) An application for a change of venue is addressed to the discretion of the trial court, and the ruling of the court thereon will not be reviewed upon appeal in the absence of a showing that the court abused its discretion.

(b) For counter affidavits held to be sufficient to put in issue the fact as to whether or not so great a prejudice existed in a county against a defendant as to prevent him from securing an unbiased and unprejudiced jury and a fair and impartial trial in said county, see opinion.

2. **CONTINUANCE—Sufficiency of Application—Appeal.** (a) An application for a continuance is addressed to the discretion of the trial court, and the ruling of the court thereon will not be reviewed upon appeal unless it is made to appear from the record that this discretion has been abused.

(b) For an application for a continuance held to be wholly insufficient on the question of diligence and also upon the question of the actual merits of the case, see opinion.

3. **EVIDENCE—Admissibility of Evidence—Testimony at Preliminary Trial—Discretionary Ruling—Appeal.** (a) Where a witness has testified in a preliminary trial and has been cross-examined by the defendant, and where the attendance of said witness cannot be obtained upon a subsequent trial of said cause, it is not error for the trial court to permit the introduction by the state of the testimony given by said witness upon such former trial.

(b) Where the evidence shows that a witness who had testified upon a preliminary trial could not be found by the officers after a diligent search, the trial court has a right in the exercise of its discretion to permit the admission of such testimony against a defendant, and upon appeal it will be presumed that this discretion was properly exercised in the absence of a showing to the contrary.

(c) For evidence which justified the trial court in admitting the previous testimony of a witness who was absent at the final trial, see opinion.

4. **APPEAL—Harmless Error—Argument of Counsel.** Where the evidence conclusively shows the guilt of a defendant of murder and the jury only convicts him of manslaughter, ordinarily the court

will not consider objections to improper remarks made by the county attorney in his closing argument to the jury.

5. **APPEAL—Harmless Error—Grounds for Reversal—Presumption of Regularity.** (a) A conviction will not be reversed on account of the action of the trial court unless two things affirmatively appear in the record: First, that the court committed error during the trial of the cause; second, that by such error the defendant was deprived of a substantial right to his injury.

(b) It is no part of the duty of the members of the Criminal Court of Appeals to act as counsel for an appellant. We will not presume that the trial judge, the county attorney, and the jury entered into a conspiracy to unlawfully deprive an appellant of his liberty, or that either of them have not faithfully performed their respective duties. Every presumption will be indulged in favor of the rulings of the trial court, the regularity of the proceedings, and the correctness of the verdict of the jury. This is necessary in order that property rights may be protected and human life may be made safe and sacred in Oklahoma.

6. **APPEAL—Presumption of Innocence.** After conviction the presumption of innocence is destroyed, and on appeal the counter presumption, that the verdict is correct and appellant guilty, prevails.

(Syllabus by the Court.)

*Appeal from District Court, Garvin County;*
*R. McMillan, Judge.*

C. F. Edwards was convicted of manslaughter in the first degree, and he appeals. Affirmed.

The material testimony in the case may be substantially stated as follows: The homicide occurred on the 15th day of April, 1911, in Garvin county, Okla., at the home of appellant, who resided four or five miles west from Pauls Valley. The deceased lived about half a mile from appellant. On the day of the homicide the deceased and appellant came to Pauls Valley driving a pair of mules belonging to deceased hitched to a wagon belonging to appellant. They were accompanied by same friends in the wagon. They bought some feedstuff and groceries, and appellant procured a quart bottle of whisky. The deceased and appellant and some other persons in the wagon with them took a drink or two of whisky on their way home

from Pauls Valley. The parties first stopped at the home of Ed Swan, where they got out of the wagon and placed in his house some goods which he had purchased. He then drove on half a mile further to the home of appellant. Up to this point there is no conflict in the evidence.

The testimony of F. L. Strickland at the preliminary trial was admitted. He testified: That on the day of the homicide he was breaking sod on appellant's farm working for appellant and that he was present at the time when the homicide occurred. That at 6:20 o'clock he left the field and went to the house. He there saw appellant and the deceased. That appellant came out of his house to the wagon. That deceased came out of the house and went to the wagon and sat down on the ground and drove a peg in the ground and was pitching his knife at it. That appellant and deceased were talking about a check which witness had given the deceased. Deceased told witness that the check had been turned down. Witness and appellant promised to pay deceased the money for the check. That they then ceased to discuss the check matter. That appellant said to deceased, "Ed, I made her come clean," and deceased replied, "My wife told the truth." Appellant then said, "I don't like to have my wife called a liar." Deceased then said, "My wife told the truth." Appellant did not make any reply to this, but he drew his knife out of his pocket and began to open it, but he did not open the knife, but drew out a revolver which he held in his right hand. Witness then took appellant by the left arm, and said, "Don't do that," and appellant replied, "Get back, or I will hurt you." Deceased was then standing up about 10 feet off, and, when ordered to turn appellant loose, witness stepped back, and appellant then walked up in front of deceased. Deceased said to appellant, "Kirk, you have got me bested." Appellant then struck deceased an upper cut with his left hand and knocked him down, at the same time holding his revolver in his right hand. Deceased got up and walked over and sat down on the wagon tongue. At this time

the pair of mules which witness had been driving ran off, and witness pursued them and caught them, and as he pulled back the lines he heard a shot. Witness was then 25 or 30 yards from the scene of the homicide. Witness started to the place where the shooting occurred and found deceased lying on the ground. Appellant was there with a pistol in his hand. Deceased did not say anything. Witness then left and returned a few minutes after, and appellant and his brother John Edwards were there. John Edwards, speaking to witness, said, "He is as good a friend as I ever had and it was all over you," referring to witness.

W. W. Campbell testified for the state that at the time of the killing he lived in a tent about 75 or 100 yards from the house of appellant; witness' attention was attracted by some loud talking; he then looked; he saw appellant standing with his arms stretched out; he heard the report of a shot; he did not see deceased at the time; witness then went up to the house of appellant and to the wagon; he there saw deceased lying on the ground; deceased lived 15 or 20 minutes after witness reached him.

Dr. Johnson testified that he examined the body of the deceased; that there was an abrasion on his face just beneath the right eye and a gunshot wound $1\frac{1}{4}$ inches behind and a quarter of an inch above the right ear and coming out on the left side three inches above and three inches behind; that the abrasion on the face of the deceased was made before death.

Dr. Lindsay testified to the same facts, and further that he saw no powder marks on the deceased when he examined the body.

B. Bruce testified that he took a photograph of the deceased; that there was a black swollen place beneath a scar under one eye on deceased's face.

Jim Young testified to the bruise on deceased's face when his body was prepared for burial.

J. S. Kercheval testified to the bruised place on the face

of the deceased, and also that he saw no powder marks on the deceased when he was prepared for burial.

Anna Edwards, the wife of appellant, testified that appellant and the deceased were pretty full of whisky at the time they came from Pauls Valley; that she first heard loud talking and then saw them scuffling; that she rushed out upon hearing the shot, and her husband came toward her and exclaimed, "What have I done?" Appellant then said he was going for a doctor, and left.

John Edwards testified that he came home in the wagon with appellant and the deceased; that they were both pretty full of whisky when they got home; that witness saw appellant and deceased scuffling and heard a gun fire and deceased fell back dead.

Appellant testified that he lived near deceased and that deceased had been friendly with him for quite a while; that when in the town of Pauls Valley on the day of the homicide he and the deceased drank considerable whisky and they had a quart bottle with them when they started home; that they took as many as 8 or 10 drinks a piece; that after they reached home appellant went into the house and talked to his wife, and while there he got his pistol and put it in his pocket; appellant said he didn't know why he put the pistol in his pocket; appellant and deceased were talking about a check that Strickland had given to deceased which had been turned down; that they then saw Strickland coming over the hill driving toward them; that a hound dog came along and started toward the chicken house; that appellant drew his pistol and said, "I believe I will shoot him;" deceased jumped up and grabbed the gun, and deceased and appellant were scuffling over the gun when they stumbled over the wagon tongue and fell, and the gun went off accidentally and killed the deceased.

A number of minor circumstances were testified to tending to impeach the testimony offered for appellant.

*Thompson & Patterson, Carr & Field,* and *Blanton & Andrews,* for appellant.

*Smith C. Matson* and *Joseph L. Hull,* Asst. Attys. Gen., and *John M. Stanley,* Co. Atty., for the State.

FURMAN, J. (after stating the facts as above). Counsel for appellant have assigned 42 different errors alleged to have been committed upon the trial of this cause and thereby brought up for review all of the rulings made by the trial court. It is the undisputed right, and it is also the duty of counsel, when they prosecute an appeal, to present for review every material question which in their judgment involves an erroneous ruling of the trial court to the injury of their clients. But it is hardly probable that the trial court would commit material error in every ruling made. It is therefore respectfully suggested that when an appeal is taken counsel can save themselves and the members of this court a great deal of unnecessary labor by selecting the questions brought up and presenting only those which have substantial merit. We know that during the hurry of a trial counsel frequently reserve exceptions without having time to determine as to whether or not they are well taken. This is also their right and duty. But after they have had time for reflection it would be the better plan if they would eliminate from the record and only present on appeal those questions which upon investigation they regard as actually meritorious. When the entire case is brought up on appeal for review it naturally suggests the inference that counsel themselves are in doubt as to all of the propositions which they have presented and do not know exactly upon what they rely.

The brief in this case covers 122 pages, which we have carefully read and re-read and considered from the beginning to the end. We will, however, only discuss those questions which go to the substantial merits of the cause.

First. When the case was called for trial, appellant presented a motion for a change of venue, in which it was set up that so great a prejudice existed against appellant in the minds

of the people of Garvin county that he could not obtain a fair and impartial trial in said county. This motion was duly sworn to by appellant and was supported by the affidavits of seven compurgators as required by law. The state filed a number of controverting affidavits to the effect that the signers thereof had read defendant's motion for a change of venue and his supporting affidavits, and that they believed the persons making said affidavits were not reliably and rightfully informed as to the condition of the minds of the citizens generally of Garvin county toward defendant, and that they further believed that an unbiased and unprejudiced jury could be obtained in said Garvin county for the trial of said cause, and that appellant could obtain a fair and impartial trial on said charge in said county. The court overruled the motion for a change of venue, to which appellant excepted. The first objection made to the ruling of the trial court is that the counter affidavits filed by the state in opposition to the motion for a change of venue were insufficient because they only expressed the opinions of the affiants and did not in direct and positive terms deny the credibility of the compurgators of appellant and state that the change was not necessary. As to whether or not the compurgators of a defendant seeking a change of venue are credible persons, necessarily, is a matter of opinion which might be based upon a great variety of circumstances which would have more or less influence with different persons. As to whether or not a change of venue should be granted in any given case is also largely a matter of opinion. No witness could swear as a matter of fact, independent of his judgment, that so great a prejudice did or did not exist in the minds of the inhabitants of a county against a defendant that an unbiased and unprejudiced jury could or could not be obtained in said county for the trial of said defendant. Any statement on this subject would necessarily be so blended with the opinions and beliefs of the affiant as to be inseparable therefrom. This is one of the cases in which persons not experts are permitted to testify as to

opinions formed by them as to conditions which could not be produced in court. See *Miller v. State, ante,* 131 Pac. 717, decided at the present term of the court. We think that the counter affidavits of the state were properly received by the court for the purpose of attacking the credibility of the compurgators of appellant and also for the purpose of showing that a change of venue was not necessary. It was the privilege of the trial court, had he been in doubt as to the merits of the application for a change of venue, to place all of the persons making affidavits, and such others as the court desired, upon the witness stand and examine them fully as to their means of knowledge and the circumstances upon which their opinions were based. We have discussed this question so often that we do not deem it necessary to enter fully into it again.

In the case of *Tegeler v. State, ante,* 130 Pac. 1164, this court said:

"Section 6766, Comp. Laws 1909, among other things provides that a change of venue may be had on the application of the defendant by petition, setting forth the facts verified by affidavit, supported by the affidavits of at least three credible persons who reside in said county. It further provides that the county attorney may introduce counter affidavits 'to show that the persons making affidavits in support of the application for a change of venue are not credible persons, and that a change is not necessary.' Under this statute, the state may file counter affidavits stating any fact or facts that would show that a change of venue was not necessary. If the court is of the opinion upon an inspection of the affidavits filed in support of and in opposition to a motion for a change of venue that a change of venue should not be granted, then it should be so ordered; but, if the court is not satisfied on this question, it may have all of the parties making these affidavits on both sides, and such other persons as the court may think proper, sworn as witnesses and examined in open court touching the matter in controversy. The presumption of law is that a defendant can get a fair and impartial trial in the county in which the offense was committed, and, if this is not true, the burden is upon the defendant to establish his right to a change of venue. The granting of a change of venue is by the Consti-

tution and statute made discretionary with the trial court, and this court will not reverse a ruling of the trial court denying an application for a change of venue, unless it is made clearly to appear that there has been such an abuse of this discretion as to amount practically to a denial of justice. By abuse of discretion is meant a clearly erroneous conclusion and judgment; one that is clearly against the logic and effect of the facts presented in support of and against the application. Whatever the decisions in other states may be, this is not an open question in Oklahoma. See *Starr v. State,* 5 Okla. Cr. 440, 115 Pac. 365; *Turner v. State,* 4 Okla. Cr. 164, 111 Pac. 988; *Black v. State,* 3 Okla. Cr. 547, 107 Pac. 524; *Johnson v. State,* 1 Okla. Cr. 321, 97 Pac. 1059, 18 Ann. Cas. 300."

We find nothing in the record which indicates that the trial court abused its discretion touching this matter. We therefore cannot review the action of the trial court in refusing to grant the application for a change of venue.

Second. When this case was first reached for trial on the 29th day of April, 1911, appellant filed a motion for a continuance in which he alleged that on the 15th day of April of the same year he had accidentally shot and killed the deceased, and that he had been incarcerated in the county jail of Garvin county ever since; that his preliminary trial on said charge was not held until the 19th day of April; that appellant had been attempting to employ lawyers since to act as counsel for him, but that he had only made temporary arrangements with certain lawyers to represent him; and that the lawyers whom he had thus employed had not had time or opportunity to prepare his case for trial. The homicide occurred at the home of appellant on Saturday afternoon about sun-down. Appellant noticed a number of persons passing his house traveling west on said afternoon and believes that some who passed along said road at said time were eyewitnesses to said accidental homicide, and that if given opportunity and time he believed he might be able to produce such witnesses, but he was then unable to give the names and residences of any such persons; that the county court of Garvin county had been continuously in session since the day of the

homicide, and the district court had also been in session a greater portion of this time; and that the lawyers whom the defendant had spoken to to represent him had been busily engaged in the trial of causes in said courts and had not been in a position to prepare defendant's case for trial. Supporting affidavits were also filed by counsel who represent appellant showing that said counsel had not been able to prepare for trial. The county attorney filed a replication to the motion for a continuance upon the ground that said motion did not show the nature and materiality of the evidence expected to be obtained, or state any fact that appellant expected to prove by the undiscovered witnesses referred to in said application; that on the 16th day of April appellant procured counsel to represent him who on that day repaired to the scene of the killing and interviewed the eyewitnesses to the transaction; that on the 17th day of April appellant and his wife executed a mortgage securing a fee of $1,500 to his counsel to represent him, and that on said day said counsel appeared before the examining court in appellant's behalf, but that the trial was postponed to the 19th day of April, at which time his said counsel again appeared and represented appellant; that appellant was arraigned on the 24th day of April and pleaded not guilty and did not seek any postponement of the trial of said cause; that the state had summoned all of the eyewitnesses to said killing, including the immediate members of the family of defendant, and said witnesses were then in court. The court thereupon postponed the trial of said cause in order that appellant and his counsel might have time to prepare for trial.

The case was again called for trial on the 30th day of May, 1911, at which time appellant again filed a motion for a continuance. The material portion of said second motion for a continuance is as follows:

"Comes now the defendant, C. F. Edwards, and shows to the court that he cannot safely go to trial at this term of the court for the reason heretofore stated in his motion for continuance filed on the 29th day of April, 1911; that he here

now renews said application as then made for the reason therein set forth, and asks that said motion be considered a part of this motion the same as if it were repeated herein in full; and petitioner further shows to the court that he has been unable to obtain the evidence of the witnesses mentioned in said motion for continuance not through any fault, neglect, or omission on his part; that he has been confined continuously since said date in the county jail of Garvin county, Pauls Valley, and that his attorneys, the firms of Blanton & Andrews, Carr & Field, and Thompson & Patterson, have been continuously occupied in the trial of cases, both civil and criminal, and of all grades in the district court of Garvin county; that they have not had the time within the space allotted by the order of this court postponing the trial hereof to secure the evidence of the witnesses mentioned by reason of being unable to get away from court a sufficient length of time to procure such evidence. Petitioner hereto attaches the affidavits of his said attorneys, and makes the same a part hereof. Petitioner further shows to the court that, if the trial of this cause is postponed to the September term of the district court of this county, he can and will procure the attendance and evidence of said witnesses; that said evidence is material to his proper defense herein; and that he cannot safely go to trial without the same."

The motion is supported by the affidavits of counsel for appellant that they had been so busy in court since their employment that they had been unable to prepare the defense of appellant in this cause. This motion was by the court overruled, to which counsel for appellant excepted. It is not necessary for us to consider as to whether or not the first application for a continuance set up facts sufficient to require the court to grant a postponement of the trial until further investigations could be made. The court did postpone the trial 30 days, and when the case was called for trial on the 30th day of May appellant renewed his motion to continue the cause for the term. The trial court was in a far better condition than this court is to determine whether or not counsel for appellant had had sufficient time within which to prepare for trial. The motion shows that appellant was represented by three of the leading law firms of Garvin county. Certainly it is not unreasonable to presume

that some of them, had they so desired, could have made all necessary investigations and preparations for trial. The motion for a continuance does not state the name of any absent witness who might be obtained, nor any facts which could be proven by any unknown witness in the event the case had been continued. No assurance whatever was given that absent witnesses could or would ever be found, or, if found, as to what their testimony would be. The law requires that an application for a continuance must state the names of the witnesses on account of whose absence a continuance is sought and their place of residence, if known, and the probability of procuring their attendance at a subsequent term, and must also state the facts expected to be proven by such absent witnesses. See *Johnson v. State,* 1 Okla. Cr. 321, 97 Pac. 1059, 18 Ann. Cas. 300. Men who are prosecuted in Oklahoma for crime must understand that this is a very serious business and that the courts cannot be trifled with and will not wait on the convenience of any man, and when a defendant seeks a continuance he must give the court something more than his opinions and hopes; otherwise it would be well-nigh impossible for the trial courts of this state to dispose of the cases before them. See *Musgraves v. State,* 3 Okla. Cr. 421, 106 Pac. 544; *Bryan v. State,* 5 Okla. Cr. 542, 115 Pac. 619. The granting or refusal of a continuance in a criminal case is largely a matter of discretion with the trial court, and this court will not review the action of a trial court in refusing to grant a continuance unless it is shown that there has been an abuse of this discretion. See *Hughes v. State,* 7 Okla. Cr. 117, 122 Pac. 554. In this case Judge Doyle, speaking for the court, said:

"The rule is well settled that the granting or refusal of a continuance, particularly for causes not enumerated in the statute, is a matter largely within the sound discretion of the trial court, and nothing but the abuse of this discretion will warrant the appellate court in interfering with the judgment. *Vance v. Territory,* 3 Okla. Cr. 208, 105 Pac. 307."

For the necessary elements of an application for a continuance on the ground of absent witnesses, see *Boswell v. State,* 8 Okla. Cr. 152, 126 Pac. 826.

We think that the application for a continuance in this case was altogether insufficient in failing to set up any legal ground why the case should be continued, and that it was addressed solely to the discretion of the trial court. There is nothing in the record indicating that the trial court abused its discretion in this matter.

Third. F. L. Strickland testified as a witness for the state in the preliminary examining trial of appellant. He was cross-examined by appellant and his testimony was reduced to writing. He was subpoenaed as a witness in behalf of the state for the final trial, and to insure his presence he was required to enter into a recognizance to appear and testify as a witness. When the trial was reached, said witness made default in his recognizance and wholly failed to appear and testify for the state.

It was shown by the state that one J. L. Aldred, a deputy sheriff of Garvin county, made an effort to serve a subpoena on F. L. Strickland, commanding him to be present at court on May 30th. He went to Ward's and Wren's, the places where witness stayed. He made inquiries of most everybody out there that knew the witness, and nobody had seen him since the Tuesday just preceding; a return was made by him on the subpoena that witness was not found in the state. The subpoena was given him Monday afternoon, the day before the trial. He had subpoenaed witness once or twice before that in this trial, but not for the 30th. It was about 12 miles out to the place he went and back. He visited Ward's and Kercheval's and all those places along out there where persons knew anything about witness. He went west where witness had a crop and had been working all the year. He was gone all afternoon, something like four hours. He made inquiries in town and in the country too, and failed to learn where the witness was. He served a

subpoena on Strickland for his appearance in this trial on May 1st; service being made on April 29th. Also served a warrant for his arrest about May 10th, and brought him in, and he was placed under bond as a witness. Strickland claimed to have a crop at Mr. Ward's. Witness testified that Strickland was not around in Garvin county where anybody knew; that he did not know where he was.

T. J. Austin, clerk of the court, swore that Strickland's bond was forfeited for his failure to appear as a witness, that morning; also against the sureties, L. M. Ward and W. M. Wren.

W. M. Wren knew Strickland, saw him last Tuesday afternoon, last about 4 o'clock, at his home. He had made a search for him since then, but could learn nothing of him. He was not in the community where he formerly lived.

L. M. Ward, the other surety, testified that he saw witness last a week ago. He had been sleeping and staying at Ward's house. Strickland told him he was going to Wren's and Ward's brothers and Joe Baur's. He has searched for him, but could not find him. He inquired at his brother's, but Strickland did not go there.

Chester Strickland, brother of F. L. Strickland, swore he saw F. L. last Saturday night a week ago at Luke Ward's; does not know where he is. Had not heard of him since then; he was an unmarried man and lived at defendant's home up to the time of the killing; their mother lived at Dewey, Okla.; F. L. did not say anything to him about going to any place.

Upon this showing the court permitted the state to introduce the written testimony of said witness taken at said preliminary trial, to all of which appellant objected and excepted.

In the case of *Warren v. State*, 6 Okla. Cr. 1, 115 Pac. 812, 34 L. R. A. (N. S.) 1121, this court held that the constitutional provision which guarantees to a defendant the right to be confronted by the witnesses against him is fully complied with when the defendant has had the opportunity to cross-

examine the said witnesses in a preliminary trial before a justice of the peace. When this has been done, and upon a subsequent trial of the said cause, if it is satisfactorily proven that such witnesses have, since the former trial, died, become insane, left the state, or that their whereabouts cannot with due diligence be ascertained, or are sick and unable to testify, the testimony of such witnesses given upon said former trial may be proven upon the subsequent trial.

In the case of *McNamara v. State,* 60 Ark. 400, 30 S. W. 762, the previous testimony of an absent witness was admitted where it was shown that a subpoena and an attachment had been in the hands of the officers for said witness, and that they had made every effort to find him and were informed by those who knew that he was out of the state.

In the case of *State v. King,* 24 Utah, 488, 68 Pac. 420, 91 Am. St. Rep. 808, the court said:

"The testimony tends to show that the witness could not be found, and the trial court had a right to exercise his discretion in the admission of the testimony, provided he did not abuse such discretion. The reasons given for the absence of the witness were reasonable, and were satisfactory to the trial court. We are not prepared to say that the discretion of the court was improperly exercised."

In the case of *People v. Boyd,* 16 Cal. App. 130, 116 Pac. 323, the court said:

"Where a trial court, in its discretion, admitted the testimony of an absent witness, given at a preliminary hearing, it must be presumed on appeal that the discretion was properly exercised."

In the case of *Shackelford v. State,* 33 Ark. 539, the previous testimony of an absent witness was admitted upon proof that the witness had been placed under a recognizance which he had forfeited and that he could not be found by the officers after a diligent search.

In the case of *People v. Melandrez,* 4 Cal. App. 396, 88 Pac. 372, the previous testimony of an absent witness was admitted,

where, after considerable search in and about the place frequented by the witness, the officers had been unable to find him.

In the case of *People v. Fish,* 125 N. Y. 136, 26 N. E. 319, the previous testimony of an absent witness was admitted, where it was proved that the witness had been subpoenaed. He stated he was going to his sister's and would appear in court. Upon his failure to appear the officers went to his sister's, but could not find him or learn of his whereabouts.

We know of no higher or safer authority than Prof. Wigmore. In volume 2, par. 1405, of his work on Evidence, Prof. Wigmore says:

"If the witness has disappeared from observation, he is in effect unavailable for the purpose of compelling his attendance. Such a disappearance is shown by the party's *inability to find* him after diligent search. The only objection to recognizing this ground of unavailability is the possibility of collusion between party and witness; but supposing the court to be satisfied that there has been no collusion, and that the search has been *bona fide,* this objection loses all of its force. For *former testimony* this cause of unavailability has long been recognized. It ought equally to suffice for *depositions.*" (Italics ours.)

In the case at bar the evidence fully justifies the conclusion of the trial court that the absent witness had left the jurisdiction of the court for the purpose of avoiding giving testimony against appellant. There is not a single circumstance in the evidence which indicates any collusion between the absent witness and the prosecution. We do not believe that the attorneys who represented appellant are in any manner responsible for the disappearance of this witness. We have not overlooked the fact that this witness previously resided at the home of appellant, and as he was the only eyewitness for the state, and as his testimony was most damaging to appellant, it is safe to assume that his absence was caused by a desire on his part to benefit appellant. If, under circumstances of this character, the state is not permitted to reproduce the testimony of a witness who had previously been confronted by appellant and who testified and was cross-examined

fully then it is within the power of a defendant or his friends to have such a witness leave the jurisdiction of the court and thereby deprive the state of his testimony altogether. This would often result in the miscarriage of justice.

We think the ruling of the trial court in all respects correct in admitting the testimony of the witness Strickland.

Fourth. Counsel for appellant complain of remarks made by the county attorney in his closing argument to the jury. It is not necessary, however, for us to discuss in detail the nature and character of the remarks made, because upon a consideration of the entire record it affirmatively appears that appellant was not injured thereby. If the minds of the jurors had been misled or inflamed against appellant by anything said by the county attorney, they never would have found appellant guilty of manslaughter in the first degree, when the evidence makes out a plain case of a brutal and a cowardly murder.

The facts of this case with unerring certainty point to the guilt of appellant and demonstrate that his defense was a pure and transparent fabrication. A few minutes before the fatal difficulty occurred appellant went to the house and armed himself with an automatic pistol, but claims not to know why he did this. He wanted the jury and court to believe that while he was quietly and peaceably talking to the deceased, who he claims was his friend, a hound dog came up, and that he (appellant) then drew his pistol from his pocket, declaring that he would shoot the dog, and that thereupon deceased without cause and without saying a word interfered and attempted to take the pistol away from appellant, and that while they were scuffling together for the possession of the pistol they fell over the tongue of the wagon, and the pistol was accidentally discharged, and the deceased was killed. Upon its face this statement is unreasonable, if not absolutely impossible. If it were true that appellant and deceased were scuffling over the pistol when it was discharged, and if it were possible for them to have had their hands in such a position that the wound could have been inflicted upon the

deceased as described by the physicians, then they would neces-
sarily have been so close together that deceased would have
been badly powder burned from the effects of the shot. The
defense of appellant is inconsistent with the physical facts of
the case. The testimony shows that there was a fresh wound
or bruised place on the face of deceased beneath his right eye
which the doctors testified was inflicted prior to death. If this
wound was inflicted by the fall of the deceased at the time
the shot · was fired, he must have fallen on his face; then
appellant could not have been in front of him struggling with
him 'for the pistol. All of the facts sustain the testimony
of the state's witness Strickland that the deceased and appellant
immediately before ·the shooting had some words with refer-
ence to a controversy involving their wives, and that deceased's
only offense consisted in stating that his. wife had told the
truth; that, angered at this, appellant pressed the controversy
and drew his pistol with one hand and knocked the deceased
down. with the other; that deceased made no resistance, but
stated to appellant, "You have got me bested"; that then
the appellant deliberately shot the deceased while the deceased
was sitting upon the wagon tongue and not making any
attack whatever upon appellant. It is true that the testimony
shows that appellant was more or less under the influence of
intoxicating liquor, but that he knew exactly what he was
doing, and that he intended to kill deceased conclusively appears
from the record. This was therefore a case of murder and·
was not manslaughter.

Instead of being influenced by improper motives or acting
upon prejudice against appellant, the record shows that the
jury in great mercy erred in convicting him of a lesser degree
of offense than that of which he was guilty.

The jury were evidently influenced. in arriving at their
verdict by the fact that appellant and the deceased previous to
the homicide had been friends, and by the further fact that
at the time of the homicide appellant was more or less under

the influence of intoxicating liquor. Yet there .is nothing in the testimony to show that appellant was so much under the influence of intoxicating liquors as to be unable to understand the nature and consequences of his act and incapable of forming a premeditated design to take the life of the deceased. On the contrary, the evidence did show that appellant acted deliberately and knew exactly what he was doing. But in this case, as they do in many others, the jury made undue allowances for the weaknesses, frailties, and imperfections of mankind, and found appellant guilty of manslaughter in the first degree when he should have been convicted of murder. But this is an error of which appellant cannot complain, because it inures to his benefit. But it at least shows that the jury were not influenced by improper motives in finding the defendant guilty, and that appellant was not injured by the remarks of the county attorney.

Fifth. A number and variety of other exceptions are presented and argued with great ability and at length in the brief by counsel for appellant. A number of the rulings made by the trial court are subject to the criticisms made by counsel, but we do not think that any of them affect the substantial questions involved in this case, or could have influenced the jury improperly against appellant. By the terms of our statute this court is prohibited from reversing a conviction upon any exception or ruling of the trial court, unless it appears from an examination of the entire record that the appellant was deprived of some substantial right thereby. See *Byers v. Territory,* 1 Okla. Cr. 677, 100 Pac. 261, 103 Pac. 532, and every case decided since by this court in which this question has been mentioned. This is not only the statute law of Oklahoma, but it is fully sustained by reason and justice. We very much doubt if an absolutely flawless trial from a technical standpoint was ever had in a hotly contested case when able counsel appeared for both sides. If convictions are to be reversed upon immaterial errors, the courts would no longer perform the duty of protecting society, but would find themselves practically the protectors of

criminals. Wherever a substantial right is involved in a technical rule this court will enforce such rule strictly. But where, as in this case, the appellant is clearly guilty, and none of the errors complained of were calculated to influence the jury to his prejudice, it would be a miscarriage of justice to set aside the conviction.

Judges should always remember that laws are enacted to be enforced, and that penalties are prescribed to be inflicted upon those who violate the law, and that courts are established and supported by the people solely for the purpose of administering justice and protecting the people in their property and in their lives, and that it is a perversion of their powers and duties for courts to administer the law for any other purpose than that of the protection of society. An appellate court has no right to assume that the trial judge, the county attorney, and the jury have entered into a conspiracy to unlawfully deprive a defendant of his liberty. These persons are all officers of the law and are acting under oath, and every presumption must be indulged in favor of the regularity, good faith, and justice of their action.

Before conviction a person charged with crime is presumed to be innocent. A defendant participates in the selection of the jury, and when a juror is accepted by a defendant he thereby vouches for the intelligence, integrity and impartiality of such juror, and he is bound thereby unless the contrary affirmatively appears from the record. Therefore, after a jury has found a defendant guilty, the presumption of innocence is destroyed, and upon appeal the counter presumption prevails; that is, that the verdict of the jury is right and that the appellant is guilty. Appellate courts have no right to act as counsel for a defendant and hunt for excuses to set aside the verdicts of juries and the judgments of courts, and no case should be reversed unless it affirmatively appears from the record that the trial court committed material error to the injury of the appellant, or that the jury were influenced by improper motives, or that the verdict is contrary to the evidence. There should

be an end to criminal trials, for it is the nearness and certainty of punishment which deters criminals and thereby protects society. This court is unalterably committed to the enforcement of these principles for the purpose of protecting property rights and making human life safe and sacred in Oklahoma.

We find no material errors in the record. The judgment of the lower court is therefore in all things affirmed.

ARMSTRONG, P. J., and DOYLE, J., concur.